J-S07020-16

2016 PA Super 143

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DANIELLE NICOLE PACKER | |
| Appellant | No. 1032 MDA 2015 |

Appeal from the Judgment of Sentence January 23, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0000360-2014

BEFORE:  BOWES, J., OTT, J., and FITZGERALD, J.[*]

OPINION BY OTT, J.: **FILED JULY 06, 2016**

Danielle Nicole Packer appeals from the judgment of sentence imposed on January 23, 2015, in the Court of Common Pleas of Centre County, after her conviction by jury on charges of murder of the third degree, aggravated assault and aggravated assault with a deadly weapon, involuntary manslaughter, simple assault, recklessly endangering another person, illegal use of noxious substances, homicide by vehicle while driving under the influence, homicide by vehicle,[1] and a variety of traffic offenses. The charges arose from a fatal automobile accident caused by Packer after she "huffed" aerosol duster. Packer received an aggregate sentence of 10 – 20

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 2702(a)(1) and (4), 2504(a), 2701(a)(1), 2705, 7303; 75 Pa.C.S. §§ 3735(a), and 3732(a), respectively.

years' incarceration. In this timely appeal, Packer claims the trial court erred in: (1) denying her motion for acquittal on the murder and aggravated assault charges, (2) improperly instructing the jury on the definition of "knowingly" regarding third degree murder and aggravated assault with a deadly weapon, and denying her request to read 18 Pa.C.S. § 302(b)(2)(ii) regarding both charges, and (3) denying her request to use a specific illustration for reasonable doubt. She also claims the Commonwealth committed a **Brady**[2] violation in failing to turn over exculpatory evidence regarding the Commonwealth's expert testimony. Following a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

On the night of August 6, 2012, Packer and her then fiancé, Julian Shutak, drove to the Walmart outside of State College, Pennsylvania. They drove Packer's mother's Chevrolet Trailblazer. At the Walmart, they purchased a video game system, some games and two cans of 3M brand aerosol dust remover. The aerosol dust remover contains 1, 1-difluoroethane (DFE), a noxious chemical[3] that can be inhaled to obtain a brief, but dangerous, high. **See** N.T. Trial, 10/29/2014, at 338-41. The method of inhaling the gas is commonly called "huffing." Video surveillance

---

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

[3] **See** 18 Pa.C.S. § 7303. It is mistakenly referred to throughout the record as a "nauseous" chemical.

from the Walmart shows Packer and Shutak leaving the store and entering the Trailblazer at approximately 9:37 p.m. While in the car, and before driving away, the two "huffed" the dust remover at least twice. After "huffing" but prior to driving, Packer asked Shutak, "Do you trust me?" to which Shutak replied, "Am I going to die tonight?" N.T. Trial, 10/29/2014, at 215. They then drove to the Sheetz store, near the Walmart, located on the corner of Shiloh Road and Benner Pike (Route 150). Shutak purchased cigarettes at the Sheetz store. With Packer driving, they left the Sheetz store, and at the stop light at Shiloh and Benner, Packer "huffed" again. At approximately 9:42 p.m.,[4] Packer, while in what Shutak described as a "zombielike state", drove out of her lane of traffic into the oncoming lane of traffic on Benner Pike. The Trailblazer narrowly missed one vehicle and then struck, head on, a Hyundai Accent driven by Matthew Snyder. Packer did not slow down, or swerve to avoid either vehicle. Although the Trailblazer was travelling under the speed limit, the crash essentially demolished the Hyundai, killing Snyder. The force of the collision pushed the Hyundai off the road down the embankment. At impact, the rear wheels of the Trailblazer lifted off the ground; causing it to make a 180 degree turn, and come to rest facing the opposite direction it had been travelling.

_____

[4] This time is taken from the accident reconstruction diagrams generated by the Pennsylvania State Police and entered and admitted into evidence as Commonwealth Exhibits 10, 11, and 12.

Packer called 9-1-1 to report the accident and during the conversation with the dispatcher asked, three times, if she would be going to prison.[5] At the accident scene, Packer spoke with both police and paramedics. She expressed concern that she would be arrested and explained to the police that she was changing the radio station at the time of the accident and may have blacked out just prior to the collision. She also told the police that prior to leaving the Walmart, she had used the aerosol duster to clean the air vents in the Trailblazer. Due to injuries she suffered in the accident, Packer was taken to the hospital. The police obtained a warrant for a blood draw and blood was taken from Packer approximately three hours post-accident. Packer was subsequently determined to have had a blood saturation of .28 mcg/mL of DFE.

Wendy Adams, forensic toxicologist, testified that .28 mcg/mL of DFE is at the lowest range of detectible amounts. However, Adams also testified that DFE is rapidly excreted from the body during exhalation and that it has an approximately 23 minute half-life. Accordingly, the three hours between the accident and the blood draw allowed for approximately seven half-lives, meaning blood concentration at the time of the accident was several times higher. Adams further testified DFE is a central nervous system depressant, that produces a quick high and can produce such effects as confusion,

---

[5] Commonwealth Exhibit 66, 67, audio recording of 9-1-1 calls.

disorientation, loss of consciousness, seizures, impaired memory, ataxia,[6] slurred speech, convulsions, and/or sudden death. N.T. Trial, 10/29/2014, at 338.

Shutak testified he had introduced Packer to "huffing" and they had "huffed" on several prior occasions. Further, Shutak claimed Packer was familiar with the debilitating effects of "huffing" and testified Packer had come close to passing out and had hallucinated on prior occasions of "huffing." *Id*. at 223, 229. When Packer gave a statement to the police, she admitted to having "huffed" on prior occasions and that she had blacked out from "huffing." *Id*. at 299.

Packer's first argument is that the trial court erred in failing to grant her motion for judgment of acquittal on the charges of third degree murder and aggravated assault because the Commonwealth failed to prove she acted with actual malice.

Our standard of review for the denial of a motion for judgment of acquittal is as follows:

> A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

---

[6] Pursuant to the American Heritage Medical Dictionary, ataxia is the lack of ability to coordinate muscle movement.

*Commonwealth v. Emanuel*, 86 A.3d 892, 894 (Pa. Super. 2014) (citation omitted).

Accordingly, the claim is essentially one of insufficient evidence. In that regard, we are reminded:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be established by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of a crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing on the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Quel*, 27 A.3d 1033, 1037-38 (Pa. Super. 2011).

As noted above, Packer argues the Commonwealth did not prove beyond a reasonable doubt that she possessed the requisite malice needed to convict her of third-degree murder and aggravated assault. Rather, she maintains, the Commonwealth demonstrated her actions were merely reckless. *See Commonwealth v. Comer*, 716 A.2d 593 (Pa. 1998) (impaired driver, speeding, causing fatality was reckless, reprehensible, but not malicious.)

Although most traffic accidents, even with an impaired driver, will not provide evidence of malice sufficient to support either third-degree murder or aggravated assault, *see Commonwealth v. Kling*, 731 A.2d 145 (Pa. Super. 1999) (with heightened *mens rea*, motor vehicle crashes seldom give rise to proof of malice), the facts attendant to this accident rise to the level of malice.

> Malice exists where there is a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Pigg*, 391 Pa.Super. 418, 571 A.2d 438, 441 (1990), *appeal denied,* 525 Pa. 644, 581 A.2d 571 (1990) (*quoting Commonwealth v. Drum*, 58 Pa. 9, 15 (1868)). Where malice is based on a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. *See Commonwealth v. Scales*, 437 Pa.Super. 14, 648 A.2d 1205, 1207 (1994), *appeal denied,* 540 Pa. 640, 6590 A.2d 559 (1995) (regarding third degree murder). A defendant must display a conscious disregard for almost certain death or injury such that it is tantamount to an actual desire to injure or kill; at the very least, the conduct must be such that one could reasonably anticipate death or serious bodily injury would likely and logically result. *See* [*Commonwealth v.*] *O'Hanlon*, *supra*, 653 A.2d [616] at 618 (regarding aggravated assault).

*Commonwealth v. Kling*, 731 A.2d at 147-48.

Here, the evidence showed that Packer was driving a Chevrolet Trailblazer while under the influence of a noxious gas. She was described by her fiancé as being in a "zombielike" state immediately prior to the impact. Because of her "zombielike" state, she took no evasive action prior to

- 7 -

impact, rather she drove directly into Matthew Snyder after narrowly missing the car in front of him.

While driving impaired and causing a fatal accident alone may demonstrate only a reprehensible recklessness, here, Packer's own words supply the proof needed to establish malice. Immediately after "huffing" and prior to driving, she asked Shutak if he trusted her. This shows an awareness of her impaired condition and the harm she might cause. This awareness was acknowledged by Shutak, who had been with her on prior occasions when they "huffed", and was concerned enough to ask if he was about to die. Nonetheless, she did not wait for the effects to pass before driving. Indeed, while operating the vehicle, not more than minutes after "huffing" at the Walmart, she "huffed" again. Packer's debilitated state was confirmed by Shutak who testified she was "zombielike", showing no awareness she was driving or was in immediate peril. She drove, without slowing or taking any evasive action directly into Snyder's vehicle. Then, in confessing to the police, she admitted that she had blacked out after prior occasions of "huffing." This statement again confirmed Packer's knowledge of the effects on her that "huffing" produced.

We believe there is a qualitative difference between knowingly driving while impaired and knowingly driving when one is aware of a strong likelihood of becoming unconscious. While impairment denotes a diminished capacity for proper functioning, unconsciousness renders a person incapable

of functioning, thereby ensuring a person has no opportunity to avoid a collision, and virtually guaranteeing some manner of accident.

Accordingly, when Packer drove her vehicle immediately after "huffing" at least three times, knowing the likelihood that she could black out and become unconscious, she "disregarded an unjustified and extremely high risk" that her actions "might cause death or serious bodily injury." *Kling*, *supra*. Therefore, the evidence presented to the jury was sufficient to prove she displayed the malice needed to support the conviction of third degree murder.

Similarly, those same actions displayed a "conscious disregard for almost certain death or serious bodily injury" needed to demonstrate the malice required to support her conviction of aggravated assault. *Id*. Therefore, Packer's sufficiency challenge fails.

Packer next claims that the trial court erred in instructing the jury, in response to a question from the jury, with different culpability definitions of "knowingly" as that word is applied to third degree murder and aggravated assault. Packer argues that in its response to the question, the trial court should have read 18 Pa.C.S. § 302(b)(2) in its entirety for both crimes. Section 302(b)(2) states:

> (2) A person acts knowingly with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

- 9 -

> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 302(b)(2)(i)-(ii).

This question regarding the definition of "knowingly" arose when, during deliberations, the jury sent a question to the court, asking:

> (1) Count 2- "Knowingly" or "Recklessly"
>
> Count 3 – Practically certain[7]
>
> Please define "practically certain" - page 3[8] - & confirm or explain why the "or recklessly" – page 2 – is included in Count #2 but not Count #3.
>
> (2) Is the term "knowingly" – page 1 – as used in Count 1 [third degree murder] the same as "knowingly" as used in Count 3 [aggravated assault with a deadly weapon] where it is defined with "practically certain that her conduct will cause such a result"
>
> If so, why is that definition not included

Court's Exhibit 1, 10/29/2014. Question (2) is the only pertinent question to this appeal. To understand this question, it must be noted that the trial court originally gave a verbatim third degree murder charge as found at

---

[7] The note had an arrow pointing down from the word "knowingly" to the words "practically certain."

[8] The references to page numbers in the jurors' note refer to pages in the 15 page packet of information given to the jurors before deliberating that contains relevant portions of the law regarding the charges Packer faced. **See** Court's Exhibit 2, 10/29/2014.

Pa.S.S.J.I. 15.2502(c) (Crim). A printed copy of this charge was given to the jury to refer to during deliberations.[9]

In relevant part, the trial judge responded to the jury's question as follows:

> And then you ask about the word knowingly as used in Count 1, which is the murder three charge. Is it the same as the knowingly used in Count 3? No. It is not and I am going to first read to you out of the Crimes Code in a section titled general requirements of culpability.[10]
>
> With respect to Count 1, a person acts knowingly with respect to a material element of the offense when if the element involves the nature of her conduct – it's the nature of the conduct – or the attendant circumstances – so that it's either the nature or the circumstance based – she is aware that her conduct is of that nature or that such circumstances exist.
>
> So essentially it's an awareness of the risk that she is creating, allegedly creating, and disregarding, okay? So with

---

[9] The printed charge, that was submitted to the jury without objection, stated, in relevant part:

> For murder of the third degree, a killing is with malice if the perpetrator's actions show her wanton and willful disregard of an unjustified and extremely high risk that her conduct would result in death or serious bodily injury to another. In this form of malice, the Commonwealth need not prove that the perpetrator specifically intended to kill another. The Commonwealth must prove, however, that the perpetrator took action while consciously, that is, **knowingly**, disregarding the most serious risk she was creating, and that, by her disregard of that risk, the perpetrator demonstrated her extreme indifference to the value of human life.

Court's Exhibit 2, 10/29/2014, at 1 (emphasis added).

[10] This refers to 18 Pa.C.S. § 302.

respect to that charge is an awareness. That's the key. An awareness of the risk that is being created and that is being disregarded.

Okay? I see you shaking heads. I feel like we are connecting here. That is good. Okay. Now interestingly –

[Defense Counsel:] Your Honor, I would ask that the Court continue with that definition with the –

The Court: I will.

[Commonwealth:] I object to that. That is not the knowingness that is required under the law.

The Court: Well yeah. I understand that. I will use that but I am going to use that to define the deadly weapon charge, okay?

Now interestingly that is the same definition for knowing, the one in murder three, as it is with the charge of aggravated assault causing serious bodily injury. It's an awareness. Awareness of the risk that is being created and being disregarded.

Now for aggravated assault with a deadly weapon a person acts knowingly with respect to a material element of the offense when if the element involves a result of her conduct. She is aware that it is practically certain that her conduct will cause that result.

So with a deadly weapon charge it's result based. The other charge is awareness of the condition and disregarding it. With respect to deadly weapon it's result focused. Looks like you understand.

Okay. Get back to work.

N.T. Trial, 10/29/2014 at 435-37.

Packer's counsel objected, claiming that portion of the charge relating to results, 18 Pa.C.S. § 302(b)(2)(ii), was appropriate for both counts. However, Packer's request was properly denied by the trial court.

For third-degree murder, the word "knowingly" clearly applies to the nature of conduct. Specifically, as noted above, the charge states:

> The Commonwealth must prove, however, that the perpetrator took action while consciously, that is, **knowingly**, disregarding the most serious risk she was creating, and that, by her disregard of that risk, the perpetrator demonstrated her extreme indifference to the value of human life.

Court's Exhibit 2, ***supra***. Therefore, only Section 302(b)(2)(i) applies. Accordingly, the trial court provided the correct answer to the specific question posed by the jurors regarding the use of the word "knowingly."

In the final claim of trial court error, Packer argues the trial court improperly granted the Commonwealth's motion *in limine*, precluding the use of a specific illustration of reasonable doubt during closing argument. ***See*** Commonwealth Motions *In Limine*, 10/22/2014, ¶¶ 18-22.

Packer sought to use an illustration of an ice skater questioning, due to weather conditions, the safety of ice on a pond before venturing onto that ice. In seeking to preclude the use of that illustration, the Commonwealth argued:

> There may be people on a jury who have who have an irrational fear of either "drowning in water," "being buried alive" as well as fear of being cold, uncomfortable in water and perhaps freezing to death on a cold day. Any one of these fears is encompassed by defense counsel's illustration. Furthermore, walking onto ice that covers a pond may seem for many people, a trivial benefit.

- 13 -

> Wherefore, The Commonwealth respectfully requests this Honorable Court to use Pa.S.S.J.I. § 7.01 and prevent Counsel for the Defendant from using an illustration that plays upon fear.

Commonwealth's Motion *In Limine*, 10/22/2014, at ¶ 22.

The trial court granted the Commonwealth's request without explanation.[11] However, other than claiming it was an abuse of discretion to limit Packer's explanation of reasonable doubt, there is no argument as to the prejudice she might have suffered by this claimed error. Although Packer can demonstrate no prejudice in this ruling, we are still concerned because (1) there appears to be nothing invalid in defense counsel's proposed illustration and (2) the Commonwealth's argument was based on nothing more than speculation and the bald assertion that Packer's counsel was somehow playing on fears that might not even exist. Accordingly, while we believe the trial court erred in precluding defense counsels' use of his proferred illustration, because Packer can demonstrate no prejudice the error was harmless. Accordingly, Packer is not entitled to relief.

In her final argument, Packer claims the Commonwealth committed a ***Brady*** violation, withholding exculpatory evidence regarding an expert evaluation of Packer's DFE blood levels.

---

[11] The trial court both read the standard jury instruction found at Pa.S.S.J.I. § 7.01, and precluded Packer from using counsel's own example. There is no concurrent claim that the trial court failed to properly instruct the jury on the concept of reasonable doubt.

> To establish a **Brady** violation, appellant must demonstrate: (1) the prosecution concealed evidence; (2) the evidence was either exculpatory or impeachment evidence favorable to him; and (3) he was prejudiced. [**Commonwealth v.**] **Chmiel**, [30 A.3d 1111] at 1130 [(Pa. 2011)] (*quoting* **Commonwealth v. Paddy**, 609 Pa. 272, 15 A.3d 431, 450 (2011)). To establish prejudice, appellant must demonstrate a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Commonwealth v. Burke**, 566 Pa. 402, 781 A.2d 1136, 1141 (2001). "Impeachment evidence[,] which goes to the credibility of a primary witness against the accused[,] is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness." **Chmiel**, at 1131 (*quoting* **Commonwealth v. Strong**, 563 Pa. 455, 761 A.2d 1167, 1175 (2000)).

**Commonwealth v. Treiber**, 121 A.3d 435, 460-61 (Pa. 2015).

As noted, Wendy Adams, a forensic toxicologist testified on behalf of the Commonwealth. She explained the effects of DFE, the speed at which it produces effects and at which it is excreted from the body. She explained the half-life of the substance. She ultimately opined, based upon the timing of when Packer "huffed" compared to the accident time and the dissipation rate, DFE was a substantial factor in causing the collision. However, a prior assistant district attorney submitted a limited number of facts to an anatomical/forensic pathologist, Dr. Harry Kamerow. At the hearing on Packer's post-sentence motion, Dr. Kamerow testified he was supplied only with the .28 mcg/mL figure but not with the relevant clinical history. Based upon the blood levels alone, Dr. Kamerow declined to give a formal opinion and declined to become involved in the case.

Packer claims the Commonwealth withheld the information that Dr. Kamerow believed DFE had no connection to the happening of the accident. To reject this allegation, we need only quote relevant testimony from Dr. Kamerow on cross-examination by the Commonwealth:

Dr. Kamerow: I did not even know there was a passenger. The same paragraph [of Wendy Adams' expert report] that discusses this states there's a three-hour interval. The half-life is 23 minutes. You know, just do the multiples, right? I mean there are multiple, multiple half-lives. She said seven half-lives have passed, explaining the low concentration. I mean, the answer to your question is very low, so you need to have a really good clinical history, and I didn't have it.

Commonwealth: So for the purposes of what the Court needs to know today, Dr. Kamerow, is the fact that you had very little information to decide whether to do a report for us in any way indicative that you signaled to the District Attorney's Office that you didn't have confidence in our theory or that you felt that we were going in the wrong direction?

A: I can answer that question eloquently. As I said, I do not remember all the details of the conversation [with the prior assistant district attorney], but I remember specifically saying to her, "Generically, I think you're correct. I'm not comfortable with this case. If you can come up more information, maybe I'll be comfortable, but at this point I'm not comfortable." I would like to express that differently.

Q: Okay.

A: You can cut me off if you like.

Q: Go ahead.

A: Apparently, the defense attorney in this case gave an interview to a newspaper, and I was given an alarming communication from my partners, because obviously they were concerned that something was in error or errant in my report. So in responding to them, I guess I can tell you what I remember about this case.

About one to two weeks ago, I received an unsolicited phone call from the Public Defender's Office asking if I had reviewed a huffing case from years ago. I said that I had a number of cases involving huffing in the past few years. This is a letter to my partners.

Q: Okay.

A: I asked if this was the case with the woefully unimpressive level, and the Assistant Public Defender said that it was – it was the case. I used the expression "woefully unimpressive" to simply jog my memory as the particular case in question. The next time I receive a call from Deborah Lux, I will ask Sally, Donna or Dana to simply gag me. Those are my secretaries.

Q: Okay.

A: I explained that I think the reviewed – I think that I reviewed the case and decided not to write a consult or bill for the review. In addition, I told the Public Defender that I would not discuss the case at all with her unless she contacted the District Attorney's Office and the District Attorney or one of her assistants are allowed to listen to any discussions. I repeated my statement that I had no comments concerning the case at this juncture. I believe the Public Defender implied in her appeal for a new trial that I opined that the level did not justify the verdict.

I said nothing of the sort, and this implication was a bold-faced lie. Furthermore, the Public Defender quoted me in the newspapers totally out of context. The quote suggests I believe the volatile[12] did not cause the accident. In fact, I generically agreed with the Assistant District Attorney in terms of huffing causing the fatal accident on review a few years ago, but the nitty-gritty details of the toxicokinetics made me nervous about the case. I politely declined the offer to consult, and I suggested that she might consult a different pathologist or a toxicologist. I

_____

[12] In chemistry, a volatile is a substance "capable of being readily vaporized." American Heritage Medical Dictionary, 2007, Houghton Mifflin. In this matter, the volatile was DFE.

neither wrote an opinion nor billed for the two hours I spent in café reviewing kinetic graphs.

I suppose the only resolution at this juncture is that I will have to be called to a hearing and I will simply tell the truth. What a novel idea for the Public Defender, Deborah Lux, to simply tell the truth. Perhaps that can be a New Year's Resolution.

Q: So at worst you would have liked to have – you declined the consult, but you would have liked to see more information. It might have actually allowed you to be our expert?

A: Rephrase that question.

Q: You declined to consult, but not for any reason other than you like science better than clinical history? Is that a fair characterization?

A: No. I did internal medicine. I worked as an ER doc for years. I have no problem aggregating information from a clinical history and making an assessment. What I was taught when I did my tox rotation and clinical chemistry in general was you never interpret laboratory values in isolation. You will go down a squirrely hole treating your patients. You will get in trouble. So everything is integrated into the clinical history, everything.

Q: Okay.

A: And so the answer is the clinical history I was supplied was not sufficient for me to be comfortable writing a statement that 1, 1-difluoroethane caused this patient to be affected significantly and caused the accident at hand, and I left the conversation with the Assistant District Attorney that, if she can get back to me with a more persuasive clinical history, you know – I did not even know the three-hour transit time, the three-hour delay, and that was a critical factor, understand. What I had was a level and a few facts. And, in my opinion, anybody writing that consult with such few facts and not knowing that three-hour delay time, in my opinion, shouldn't be writing a consult.

Q: And from the report that we actually used, you can see there was certainly tons more clinical facts in this case that supported the opinion?

A: Yeah. If I had the affidavit, the depositions, the clinical history, the police report, the draw time, the accident time, yeah, I think that the clinical history of that review is perfectly adequate, and I would have written it and been happily working as an expert witness and being paid for my time. But, you know, we all have to – we all have to write that sentence at the end of those reports, and you have to get on the witness stand and believe what you're saying, and in this case I was uncomfortable and declined the case.

N.T. Post-Sentence Motion Hearing, 4/20/2015, at 21-26.

It is patently clear from reading the notes of testimony from the hearing on Packer's post-sentence motion that Dr. Kamerow would not have provided any exculpatory or impeachment evidence. Accordingly, the Commonwealth did not commit a **Brady** violation and Packer is not entitled to relief on this issue.

Judgment of sentence affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/6/2016