J-S27013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENNETH WHITE | : | |
| | : | |
| Appellant | : | No. 1670 EDA 2019 |

Appeal from the Judgment of Sentence Entered May 7, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001702-2018

BEFORE:   SHOGAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 11, 2020**

Appellant, Kenneth White, appeals from the judgment of sentence entered on May 7, 2019, in the Court of Common Pleas of Philadelphia County. We affirm.

This case stems from an altercation that occurred on December 31, 2017, and gave rise to charges filed against Appellant.  The trial court provided a thorough and comprehensive recitation of the testimony provided at trial in its Pa.R.A.P. 1925(a) opinion filed September 23, 2019, that outlines the facts of this case.  We shall not repeat those lengthy facts herein.

On February 25, 2019, Appellant was found guilty by a jury of third-degree murder and possession of a firearm prohibited.[1]  Appellant was

_____

[*]  Former Justice specially assigned to the Superior Court.

[1]  18 Pa.C.S. §§ 2502(c) and 6105, respectively.

sentenced on May 7, 2019, to fifteen to thirty years imprisonment for third-degree murder and a concurrent two and one-half to five years of imprisonment for possession of a firearm prohibited.

On May 15, 2019, Appellant filed a post-sentence motion, which was denied on June 5, 2019.  On June 11, 2019, Appellant filed a notice of appeal. Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following issues for our review:

A.    Was the evidence insufficient to support the third-degree murder conviction?

B.    Was the third-degree murder conviction against the weight of the evidence?

C.    Did the trial court commit an abuse of discretion by imposing the sentence it did on Appellant?

Appellant's Brief at 4.

In his first two issues, Appellant challenges the sufficiency and weight of the evidence as it relates to his conviction of third-degree murder.  The standard for evaluating sufficiency claims is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder['s]. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth

may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Estepp*, 17 A.3d 939, 943-944 (Pa. Super. 2011).

The law pertaining to weight-of-the-evidence claims is well settled. The weight of the evidence is a matter exclusively for the fact finder, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Forbes*, 867 A.2d 1268, 1272–1273 (Pa. Super. 2005). The grant of a new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. *Commonwealth v. Bruce*, 916 A.2d 657, 665 (Pa. Super. 2007). Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. *Id.* An appellate court's purview:

is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Knox*, 50 A.3d 732, 738 (Pa. Super. 2012) (internal citations omitted). An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. *Forbes*, 867

A.2d at 1273. "[T]he trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." ***Commonwealth v. Diggs***, 949 A.2d 873, 879–880 (Pa. 2008).

> Case law has defined the elements of third degree murder as follows:
>
> To convict a defendant of the offense of third degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but ... also a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

***Commonwealth v. Fisher***, 80 A.3d 1186, 1191 (Pa. 2013).

The trial court's September 23, 2019 opinion comprehensively and correctly disposes of Appellant's first two issues raised on appeal. Accordingly, we affirm the decision of the trial court on these two issues, and do so based on the analysis outlined in its opinion.

In his third issue, Appellant argues that the trial court abused its discretion in sentencing Appellant. Appellant's Brief at 39. Appellant contends that the sentencing court failed to consider Appellant's background, character, and rehabilitative needs before imposing an excessive sentence under the circumstances. ***Id.*** at 39. Appellant further maintains that the trial court imposed a sentence "that was excessive under the circumstances in the absence of reasons for imposing such an excessive sentence other than the seriousness of the crime." ***Id.*** Finally, Appellant argues that the sentencing court exceeded the applicable sentencing guidelines without providing

adequate reasons for doing so or acknowledging on the record that it was aware of the applicable sentencing guidelines, in violation of the law. *Id.* at 39-40.

Appellant's issue challenges the discretionary aspects of his sentence. We note that "[t]he right to appellate review of the discretionary aspects of a sentence is not absolute." *Commonwealth v. Zirkle*, 107 A.3d 127, 132 (Pa. Super. 2014). Rather, where an appellant challenges the discretionary aspects of a sentence, the appeal should be considered a petition for allowance of appeal. *Commonwealth v. W.H.M.*, 932 A.2d 155, 163 (Pa. Super. 2007).

As we observed in *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (citing *Commonwealth v. Evans*, 901 A.2d 528 (Pa. Super. 2006)):

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
>> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Id*. at 170. Whether a particular issue constitutes a substantial question about the appropriateness of sentence is a question to be evaluated on a case-by-

case basis. ***Commonwealth v. Kenner***, 784 A.2d 808, 811 (Pa. Super. 2001).

Here, the first three requirements of the four-part test are met: Appellant filed a timely appeal; Appellant preserved the issue of imposition of an excessive sentence in his post-sentence motion; and Appellant included a statement raising this issue in his brief pursuant to Rule 2119(f). ***Moury***, 992 A.2d at 170. Therefore, we address whether Appellant raises a substantial question requiring us to review the discretionary aspects of the sentence imposed by the sentencing court.

"We examine an appellant's Rule 2119(f) statement to determine whether a substantial question exists." ***Commonwealth v. Ahmad***, 961 A.2d 884, 886-887 (Pa. Super. 2008). Allowance of appeal will be permitted only when the appellate court determines that there is a substantial question that the sentence is not appropriate under the Sentencing Code. ***Commonwealth v. Hartle***, 894 A.2d 800, 805 (Pa. Super. 2006). A substantial question exists where an appellant sets forth a plausible argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process. ***Id***.

In his Pa.R.A.P. 2119(f) statement, Appellant asserts that "although the sentence is within the statutory limits and the standard range of sentences, the sentence imposed is manifestly excessive and unreasonable because the sentencing court did not consider his mitigating circumstances and also

considered impermissible factors like [A]ppellant's alcoholism when deciding on the sentence it imposed." Appellant's Brief at 38. "[T]his Court has held that an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question." *Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014) (citation omitted). Because Appellant has presented a substantial question, we proceed with our analysis.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006).

> When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S. § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of defendant, and it must impose an individualized sentence. The sentence should be based on the minimum confinement consistent with the gravity of the offense, the need for public protection, and the defendant's needs for rehabilitation.

*Commonwealth v. Ferguson*, 893 A.2d 735, 739 (Pa. Super. 2006). Guided by these standards, we must determine whether the court abused its discretion by imposing a "manifestly excessive" sentence that constitutes "too severe a punishment." *Id.* Moreover, this Court has explained that when the "sentencing court had the benefit of a presentence investigation report

("PSI"), we can assume the sentencing court 'was aware of relevant information regarding defendant's character and weighed those considerations along with mitigating statutory factors.'" *Moury*, 992 A.2d at 171.

Here, Appellant's sentence of fifteen to thirty years of incarceration is statutorily permissible. *See* 18 Pa.C.S. § 1102(d) ("a person who has been convicted of murder of the third degree . . . shall be sentenced to a term which shall be fixed by the court at not more than 40 years.").

Moreover, the sentence is within standard range of sentencing guidelines. "[W]here a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code." *Moury*, 992 A.2d at 171. The conviction carried an offense gravity score of fourteen, and Appellant had a prior record score of three, with use of a deadly weapon enhancement. N.T., Sentencing, 5/7/19, at 3. As such, Appellant's attorney at the sentencing hearing acknowledged that the guidelines provided for a sentence of 138 months to the statutory limit. *Id.* at 3. As noted previously, the statutory limit for third-degree murder is forty years. 18 Pa.C.S. § 1102(d). Thus, the limit for a minimum sentence was twenty years. Accordingly, Appellant's minimum sentence of fifteen years was within the recommended guideline range. 204 Pa.Code § 303.17(b).[2]

---

[2] We again note that Appellant has admitted that "the sentence is within the statutory limits and the standard range of sentences." Appellant's Brief at 38.

The trial court also placed its reasons for sentencing on the record and

imposed an individualized sentence. At sentencing, the trial court stated:

**THE COURT**: The [c]ourt reviewed the pre-sentence report, the mental health evaluation, the letters sent on behalf of [Appellant] by his family and the Commonwealth's sentencing memorandum. The [c]ourt is very familiar with the facts of this case and listened very carefully to the victim impact testimony.

The pain in this room is palpable. What that means is you could feel it, it is so strong, how the acts of one person can cause such deep and lasting pain.

The problem with this is, and I hear what [Appellant] is saying, that he had a longstanding relationship with this young man but the bottom line really is this, it is [Appellant] who introduced alcohol into the situation. You had a drinking problem. When you have a drinking problem, you don't think right. When you don't think right, you make poor decisions and you cause a lot of problems.

You introduced the gun into the situation because without a gun, you would have been fairly harmless against him but you went out of your way to put that gun -- I don't know why -- into the couch seat, so it was right there when the conflict occurred. You introduced the anger and conflict into the situation, fueled by alcohol.

You kept this going. You just kept it going. You instigated a situation. How could you not think a young man would stand up for his mother, his sister? It is unreasonable. That is what alcohol does to your brain. There is no young man that will let you threaten his mother and not have a strong reaction to that.

All of that conduct, that came from you, sir, and it was a recipe for disaster and I don't give a lot of weight to what somebody does afterward because I know that people do all sorts of things after an event like this happens because they are frightened but I give it some weight, a little weight.

If you loved him like a son, you stay there. You help. You admit what you did. You remain there and you try to ameliorate the damage that you did, and the problem here is because of your

alcohol addiction, because of your anger, you took a life and because you took that life, you ruined so many lives, fatherless children. We have people here who are suffering, really suffering.

I do take into consideration the age of this [Appellant]. He is 62 years old. The fact that for 13 years, he remained arrest free, and that he does have a serious substance abuse problem. It is presently with alcohol but he had a substance abuse problem throughout his life.

Based on everything I have said, the sentence of the [c]ourt is, as follows: On the charge of third degree murder, the sentence of this Court is 15 to 30 years, possession of a firearm prohibited, 2-and-a-half to 5 years to run concurrently. Funeral expenses are ordered in the amount of $4,152.00. Court costs are ordered.

N.T., Sentencing, 5/7/19, at 35-38.

Thus, as reflected in statements made at the sentencing hearing, the trial court discussed its rationale at length on the record. It considered all relevant evidence, including the sentencing guidelines and the relevant factors of protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of defendant. *Ferguson*, 893 A.2d at 739. Furthermore, the trial court had the benefit of a PSI. Thus, we can presume the sentencing court was aware of relevant information regarding Appellant's character and weighed those considerations along with mitigating factors. *Moury*, 992 A.2d at 171. As a result, we conclude that Appellant failed to establish that the trial court abused its discretion in sentencing him. Thus, Appellant is entitled to no relief on this claim.

Judgment of sentence affirmed.[3]


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


Date: <u>12/11/2020</u>

---

[3] The parties are directed to attach a copy of the trial court's September 23, 2019 opinion in the event of further proceedings in this matter.



**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA   :         CP-51-CR-0001702-2018

                               :

        v.                    :

                               :

KENNETH WHITE               :         1670 EDA 2019

## OPINION

Rose Marie DeFino-Nastasi, J.                           September 23, 2019

## PROCEDURAL HISTORY

On February 25, 2019, Kenneth White ("the Defendant") was found guilty by a jury, presided over by the Honorable Rose Marie DeFino-Nastasi, of third-degree murder[1] and possession of a firearm prohibited.[2] He was sentenced on May 7, 2019, to fifteen to thirty years imprisonment for third-degree murder and a concurrent two-and-one-half to five years for possession of a firearm prohibited. The aggregate sentence was fifteen to thirty years of imprisonment.

On May 15, 2019, the Defendant filed a Post-Sentence Motion, which was denied on June 5, 2019. On June 11, 2019, the Defendant filed a Notice of Appeal to the Superior Court. On September 3, 2019, pursuant to this Court's 1925(b) order, the Defendant filed a Statement of Matters Complained of on Appeal, claiming:

    I.    The evidence was insufficient to support the verdict of third-degree murder;

    II.   The verdict of third-degree murder was against the weight of the evidence; and

    III.  The trial court abused its discretion at sentencing when the trial court:

---

[1] 18 Pa.C.S. § 2502(c).
[2] 18 Pa.C.S. § 6105.

a. Sentenced the Defendant without providing sufficient reasons for the sentence imposed;
b. Failed to give careful consideration to all relevant factors;
c. Gave improper weight to the fact that the Defendant was intoxicated at the time of the shooting, concluding that since his intoxication was voluntary, it was a factor to aggravate his sentence rather than mitigate his sentence since the very nature of alcoholism is the struggle one suffers from controlling the addiction itself;
d. Did not properly consider that the Defendant is seriously infirm, suffering from numerous serious chronic ailments;
e. Failed to take into account the remorse and shame felt by the Defendant; and
f. Failed to take into account that there was only one shot fired and this occurred while the decedent was in a struggle with the Defendant grabbing for the gun as the Defendant was falling backwards.

**FACTS**

Police Officer Edgar Vazquez testified that on December 31, 2017, he received a dispatch of a shooting at 5736 Leonard Street. Upon arriving at the scene, Officer Vazquez observed two females and one male attempting to aid the decedent, who had a gunshot wound to the left side of the chest. Officer Vazquez and Officer Ocasio helped the paramedics place the decedent into the ambulance and he was taken to Einstein Hospital, where he was pronounced dead at 1:37 p.m. Notes of Testimony ("N.T."), 2/21/2019 at 105–10.

Officer Edwin Ocasio testified that on December 31, 2017, he received a radio call at approximately 12:55 p.m. of a shooting at 5736 Leonard Street. After placing the decedent in the ambulance, Officer Ocasio stayed on scene and spoke with the decedent's mother, Gloria Brown. Ms. Brown told Officer Ocasio that the Defendant was her ex-boyfriend with whom she and her children still lived. She and the Defendant were having an argument when the decedent intervened and began arguing with the Defendant. During the course of the argument the Defendant retrieved a handgun from under the couch, cocked it and pointed it at the decedent. The decedent attempted to hold the Defendant's arms down and the Defendant fired the gun,

2

hitting the decedent in the chest. The Defendant then fled the scene in a black Kia Sorento. N.T., 2/21/2019 at 216–21.

Tanyiah Jackson testified that the decedent was her brother. On December 31, 2017, Tanyiah lived with the decedent, her mother (Gloria Brown), her two-year-old son, and the Defendant. The Defendant and Ms. Brown had recently ended an eleven year relationship. As a result of the relationship ending, Tanyiah, the decedent, and Gloria were planning to move out of the Defendant's house within the week. N.T., 2/21/2019 at 116–20.

On the night of December 30, 2017, into the early morning hours of December 31, 2017, Tanyiah, Ms. Brown, the decedent, and the Defendant were at a party at a friend's house. While Tanyiah and Ms.Brown were still at the party, the Defendant went home and called Ms. Brown to tell her that he was throwing her belongings out onto the porch. Tanyiah and Ms. Brown left the party and returned home to find Ms. Brown's belongings on the porch. The decedent and a neighbor (Jeannette Moore) moved the items back into the house. Ms. Brown and the Defendant, who was drunk, began arguing about when Ms. Brown was moving out. *Id.* at 122–28.

After the argument quieted down, everyone sat around the living room talking for about an hour. At that time, Ms. Brown asked the Defendant where he placed her gun when he was moving her belongings. The Defendant said that he did not have it, but that he knew where it was. He would not tell Ms. Brown where it was located. Tanyiah, Ms. Brown, Ms. Moore, and the decedent searched for the gun but were unable to find it. Approximately 6:00 a.m., on December 31, 2017, Ms. Moore went home and everyone else went to sleep. *Id.* at 126–30.

Tanyiah woke up around ten or eleven a.m. and heard the Defendant and Ms. Brown arguing again. Tanyiah called Ms. Moore and asked her to come back over to help calm the situation. The argument escalated and the decedent came up from the basement to intervene.

3

The decedent said to the Defendant: "We said we're leaving. Be a man. You're always telling me to be a man. We're leaving. Just leave her alone." The Defendant then approached the decedent and threatened to get his cousin Mitchell to come and kill him. *Id.* at 131–38.

Ms. Brown broke up the argument between the decedent and the Defendant and the Defendant walked upstairs. The Defendant then came back downstairs, put his coat on and said something to the decedent. This caused the decedent to respond.[3] The Defendant then retrieved the gun from under the couch, cocked the gun and pointed it at the decedent. *Id.* at 140–42.

The Defendant moved towards the decedent, and the decedent attempted to swat the gun out of the Defendant's hand. In the struggle for the gun, both men fell to the floor. The decedent attempted to hold the Defendant's arms down, but the Defendant moved the gun towards the decedent and pulled the trigger. *Id.* at 143–46, 165–66, 203.

After the gun went off, the Defendant said: "he [the decedent] shot himself." Tanyiah began screaming and pushed the Defendant out of the house. She picked up a stick and was going to hit the Defendant with it, but the Defendant showed Tanyiah the gun and said: "don't do it Tanyiah." The Defendant then jumped into a car and drove off. A video showing Tanyiah and the Defendant's interaction outside the house immediately following the shooting was played for the jury. *Id.* at 146–50, 158–63.

Gloria Brown testified that she had been living at the 5736 Leonard Street for approximately four or five years before the shooting, and the decedent had been living there for two years. At the party on December 30, 2019, the Defendant approached Ms. Brown and asked her for sex. She declined, and he called her a "b*tch" and left. Ms. Brown left the party and returned home upon receiving a call from the decedent that her belongings were outside the

---

[3] Tanyiah did not hear what either man said. N.T., 2/21/2019 at 114.

4

house. When Ms. Brown returned to the house, she and the Defendant argued until four or four-thirty in the morning, at which time she went to bed. Ms. Brown was awakened at six-thirty or seven o'clock in the morning by the Defendant, who asked her to get back together with him. Ms. Brown said "no" and went back to sleep. N.T., 2/21/2019 at 236-49.

At approximately 11:00 a.m., Ms. Brown was in the kitchen cooking. The Defendant, who was intoxicated, entered and began arguing with her again. *Id.* at 249-52.

During the argument, the decedent came upstairs from the basement into the kitchen. The decedent said: "I'm tired of you all arguing all the time. Mr. Kenny, you told me to act like a man. She's leaving on Friday. You're 60-something years old. Act like a man." The Defendant then threatened to have his nephew kill the decedent. The decedent responded that he was not afraid,[4] and the Defendant pulled Ms. Brown's gun from under the couch.[5] The Defendant cocked the gun and pointed it at the decedent. The decedent grabbed the Defendant's arms and tried to move them down but the Defendant fired the weapon from point blank range into the decedent's chest. The decedent did not touch the Defendant prior to the Defendant pointing the gun at him. After shooting the decedent, the Defendant walked out of the house and drove off. *Id.* at 252-59.

Jeanette Moore testified that in the early morning hours of December 31, 2017, she received a phone call from Ms. Brown asking if her belongings were outside. Ms. Moore informed Ms. Brown that they were, and Moore helped the decedent bring the belongings back into the house. When Ms. Brown returned home, Moore witnessed Ms. Brown and the Defendant arguing. Ms. Moore asked the Defendant where Ms. Brown's gun was located. The

---

[4] The decedent and the Defendant got in a fight a year a prior to the shooting, the decedent got the better of the Defendant in the fight. N.T., 2/21/2019 at 172-74.
[5] Ms. Brown's gun was a 38 revolver that was pink, black and silver in color. The gun was not recovered. N.T., 2/22/19 at 73.

Defendant said he knew where it was but would not give it to Ms. Moore or Ms. Brown. Ms. Moore left the house at around five a.m. N.T., 2/22/2019 at 79–85.

Ms. Moore returned to the house around twelve in the afternoon the next day. Ms. Brown and the Defendant were having the same argument they had been having earlier that morning when Moore had last been there. The decedent came upstairs and said to the Defendant: "[W]hy don't you leave her alone. We're leaving Friday. Just leave her alone." The Defendant and the decedent began to argue. The Defendant threatened to have somebody kill the decedent. The Defendant then pulled Ms. Brown's gun from underneath a cushion on the couch. The Defendant cocked the gun and pointed it at the decedent. Moore was scared and ran outside. As she was running she heard a single gunshot. *Id.* at 86–95.

Dr. Khalil Wardak, Assistant Medical Examiner, testified that the decedent's cause of death was a gunshot wound to the chest. Furthermore, the muzzle of the gun was in contact with the body of the decedent when the firearm was discharged. N.T., 2/22/2019 at 127–36.

Police Officer Edwin Torres testified that on January 1, 2018, he observed the Defendant's Kia Sorento outside of a beer distributor located at the 5400 block of Large Street. N.T., 2/22/2019 at 139–42.

Detective James Sloan testified that he recovered video surveillance from the beer distributor where the Kia Sorento was located. The video was played for the jury. The video depicts the Defendant inside the beer distributer. On video, the Defendant pulls a revolver out of his pocket and looks at it. No gun was recovered. N.T., 2/22/2019 at 144–56.

Crime Scene Officer Christine Hilbert testified that she recovered four live .38 special cartridges from the couch inside the Defendant's house. N.T., 2/22/2019 at 171–78.

6

Police Officer Ronald Weitman from the Firearms Identification Unit, testified that the bullet recovered from the decedent's body was a .38/.357 caliber. N.T., 2/22/2019 at 191–200.

## ANALYSIS

### ISSUE I

The Defendant's first claim is that the evidence was insufficient to support the verdict of third-degree murder. Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Baumhammers*, 960 A.2d 59, 68 (Pa. 2008). The Commonwealth may sustain its burden of proving each element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Estepp*, 17 A.3d 939, 943 (Pa. Super. 2011) (*citing Commonwealth v. Brooks*, 7 A.3d 852, 856–57 (Pa. Super. 2010)).

In addition, the fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder. *Commonwealth v. Treiber*, 874 A.2d 26, 30 (Pa. 2005). The Superior Court considers all the evidence admitted, without regard to any claim of wrongly admitted evidence. *Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa. Super. 2010). The Superior Court will also not weigh the evidence or make credibility determinations. *Id.*

Third-degree murder is any unlawful killing committed with malice aforethought. 18 Pa.C.S. § 2502(c); *Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005). Evidence is sufficient to sustain a conviction for third-degree murder when the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the accused is responsible for the killing; and

7

(3) the accused acted with malice. *Id.* Malice is defined as "a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown that the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause the death or serious bodily injury [of another]." *Commonwealth v. Packer*, 146 A.3d 1281, 1285 (Pa. Super. 2016). Malice may be established through circumstantial evidence, such as the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Crosley*, 180 A.3d 761, 767 (Pa. Super. 2018).

The evidence presented at trial was that the Defendant and the decedent were in a verbal altercation when the Defendant retrieved a loaded gun that he had hidden underneath a couch cushion, pointed the gun at the decedent and cocked the hammer. The Defendant then approached the decedent with the gun pointed at him. The decedent attempted to ward off the attack by swatting at the gun and grabbing hold of the Defendant's arms. The Defendant pulled the trigger, discharging the firearm when the barrel of the gun was in contact with the decedent's chest. The decedent died as a result of the gunshot wound. Brandishing a loaded firearm, pointing it at the mid-section of the decedent, and pulling the trigger when the weapon is in contact with the decedent's body most certainly shows a conscious disregard of an unjustified and extremely high risk that death or serious bodily injury might occur. Therefore, there was sufficient evidence to sustain the Defendant's conviction for third-degree murder.

## ISSUE II

The Defendant's second claim is that the verdict of third-degree murder was against the weight of the evidence. The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011), app. Denied, 42 A.3d 1059

8

(Pa. 2012) (citation omitted). "[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). Accordingly, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). A trial judge should not grant a new trial due to "a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* at 1055. The initial determination regarding the weight of the evidence is for the fact-finder. *Commonwealth v. Jarowecki*, 923 A.2d 425, 433 (Pa. Super. 2007). The trier of fact is free to believe all, some or none of the evidence. *Id.* Only where the jury verdict "is so contrary to the evidence as to shock one's sense of justice" should a trial court afford a defendant a new trial. *Id.*

The jury's verdict did not "shock one's sense of justice." Although there were minor inconsistencies as to the position of the Defendant and the decedent at the time of the shooting, all three eyewitnesses were clear on their testimony that the Defendant threatened to have the decedent killed, moments before retrieving a hidden firearm, cocking it, pointing it at the decedent, and firing at close range. Tanyiah Brown testified that she saw the Defendant pull the trigger. Therefore, the verdict was not against the weight of the evidence.

## ISSUE III

The Defendant's third claim is that the trial court abused its discretion at sentencing when the trial court:

1. Sentenced the Defendant without provided sufficient reasons for the sentence imposed;
2. Failed to give careful consideration to all relevant factors;

9

3. Gave improper weight to the fact that the Defendant was intoxicated at the time of the shooting, concluding that since his intoxication was voluntary, it was a factor to aggravate his sentence rather than mitigate his sentence since the very nature of alcoholism is the struggle one suffers from controlling the addiction itself;
4. Did not properly consider that the Defendant is seriously infirm, suffering from numerous serious chronic ailments;
5. Failed to take into account the remorse and shame felt by the Defendant; and;
6. Failed to take into account that there was only one shot fired and this occurred while the decedent was in a struggle with the Defendant grabbing for the gun as the Defendant was falling backwards

The Defendant's claim is without merit. "Sentencing is a matter vested within the discretion of the trial court and will not be disturbed absent a manifest abuse of discretion." *Commonwealth v. Crump*, 995 A.2d 1280, 1282 (Pa. Super. 2010). "An abuse of discretion requires the trial court to have acted with manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.* "A sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Id.* at 1283.

Here, the record as a whole reflects the sentencing court's consideration of the sentencing guidelines, facts of the crime and character of the offender. *See* N.T., 5/07/2019 at 35–38 (attached as "Exhibit A" where this Court thoroughly reviewed the considerations for sentencing).

The court did not abuse its discretion in sentencing.

10

## CONCLUSION

Based on the foregoing, the Petitioner's judgement of sentence should be affirmed.

By the Court:

Rose Marie DeFino-Nastasi, J.

11

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA  :    CP-51-CR-0001702-2018

                                  :

        v.                        :

                                  :

KENNETH WHITE                :        1670 EDA 2019



# **<u>EXHIBIT A</u>**

# First Judicial District of Pennsylvania

*51CR00017022018*
*Kenneth White*

*Sentencing Volume 1*
*May 07, 2019*



**Court Reporting System**

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

*Original File 5-7-19^KENNETH^WHITE.txt, 40 Pages*
*CRS Catalog ID: 19050919*

Page 1

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

COMMONWEALTH        : CP-51-CR-0001702-2018

vs.

KENNETH WHITE        :

- - -
Tuesday, May 7, 2019
- - -
Courtroom 1107 - The Juanita Kidd
Stout Center for Criminal Justice
Philadelphia, Pennsylvania
- - -
SENTENCING
- - -
BEFORE: THE HONORABLE ROSE MARIE DEFINO-NASTASI, J.
- - -
APPEARANCES:
        SHEIDA GHADIRI, ESQ.
        Assistant District Attorney
        For the Commonwealth
        COLEY REYNOLDS, ESQ.
        For the Defendant

- - -

Page 2

Commonwealth vs. White

THE COURT: We are here for sentencing.

Has Counsel had the opportunity to review the pre-sentence report and the mental health?

MS. GHADIRI: Yes, Your Honor.

MR. REYNOLDS: Yes, Your Honor.

THE COURT: Do we agree that the offense gravity score is a 14, with deadly weapon used and a prior record score, I have as a 4.

I heard there is a problem with that?

MS. GHADIRI: Correct, Your Honor.

Your Honor, there is a 1978 conviction for 6105.

THE COURT: 6105 or 6106?

COURT CLERK: 6106.

MR. REYNOLDS: I'm sorry, 6106. They have it graded as a felony of the third degree. I believe it should be graded as a misdemeanor.

THE COURT: It is still a 1.

Page 3

Commonwealth vs. White

Now, I don't go back to '78 but weapons offenses were always counted as a 1, whether they were misdemeanors or not. You have to find it.

What is your argument, that he is a 3?

MR. REYNOLDS: My argument is he is a 3, Your Honor.

THE COURT: So 14-3, deadly weapon used, what are the guidelines on that?

MR. REYNOLDS: They are 138 to the statutory limit.

THE COURT: What is the Commonwealth's position? Did anyone look this up?

MS. GHADIRI: Your Honor, Mr. Reynolds addressed this with me this morning. I had graded it as a 1 based on the VUFA charge, as well as what is in the PSI. Other than this issue being addressed now, I did not look to see if in 1978, if it was graded as a different or the offense gravity score in that case --

Page 4

Commonwealth vs. White

THE COURT: Do we even have the guidelines from 1978?

MR. REYNOLDS: That is part of the problem.

MS. GHADIRI: It looks like the statute, itself, was amended in 1997. It just says Subsection A but does not indicate what in Subsection A was amended.

MR. REYNOLDS: It never made it out of M.C. Court. We know it was a misdemeanor.

THE COURT: What is 6108, how many points is that?

MR. REYNOLDS: It is a 1.

THE COURT: So is POW, Possession of an Offensive Weapon.

MR. REYNOLDS: Right.

THE COURT: Any weapons offenses are a 1, that is just the way it is.

So let's begin.

COURT CRIER: State your full name, spell your last name.

THE DEFENDANT: Kenneth White;

Commonwealth vs. White

W-H-I-T-E.

---

KENNETH WHITE, the Defendant, having been first duly sworn, was examined and testified, **as follows:**

---

THE COURT: Go ahead, Counsel.

MR. REYNOLDS: Your Honor, good morning.

Your Honor, I have reviewed both the pre-sentence report, the mental health evaluation, all of the documents and reports submitted from pretrial services.

I also submitted to the Court a number of letters which I recently received in regard to this matter. I also submitted a letter that I received this morning from my client. I know my client is extremely remorseful and wants to address the Court. He will obviously do it later this afternoon.

Right now, Your Honor, I would like to point out a few things. First,

Commonwealth vs. White

Your Honor, this was an extremely difficult case and I know that there was some consideration for the jury on manslaughter and I still believe that it was a manslaughter case.

I know the jury's verdict. I respect it, at least at this point. We will be filing our motions for an appeal on this but I really believe that this was an accident, Judge.

I really believe that, yes, he was reckless. He shouldn't have taken the gun out. He was stupid. He was drunk and that certainly created a bad place and created this situation but at the moment, the testimony was pretty clear that the gun went off while the decedent was tackling my client, as he was falling backward and as you are going to hear from my client, when he fell backward, his arm hit the wall and that is when the gun went off. It is a tragic, tragic accident.

The jury came back with a third degree murder conviction. We

Commonwealth vs. White

understand that, but that doesn't mean that you can't depart from the guidelines and fashion a sentence at least that is appropriate for what you believe you've heard the facts are.

You might completely disagree with me and, again, I understand that, Judge. That is your prerogative, but I don't think this is a 20 to 40 case. We do 20 to 40 cases for people who intentionally kill people all of the time. There is no intention in this murder and to give him a 20 to 40, which is what the Commonwealth is asking for, blows away all sense of proportionality and justice, Your Honor.

Judge, I want to note some things from the pretrial report. As you can see, Mr. White did not have a great upbringing. His father was verbally abusive. His mother was a drunkard and so was his father. He saw the father only we weekends. The death of the mother was a great burden on him. It affected him greatly.

Commonwealth vs. White

Mr. White, himself, suffered from drug and alcohol abuse starting from an early age. By 14, he was doing heroin. He pretty much did every drug that came out. When crack came out, he was doing crack. When oxy came out, he was doing oxy. He was self-medicating his whole life. He never was treated.

As he readily admits to the investigator, and to Counsel, and I believe to you, every problem he's had has been drug-related. He either committed crimes for money to buy drugs or he committed crimes while he was either high or drunk. He recognizes that. He knows there is no going back but it is still a consideration that the Court should take.

He has six children, Your Honor. By all counts, he is a great father, a great grandfather to them. He has his GED, Your Honor. At the time of his arrest, he was steadily employed.

His physical condition, Your Honor, is one of great concern. He has

Page 9

Commonwealth vs. White

cirrhosis of the liver, which has been getting worse, hepatitis C and he informed me this morning that he has just been diagnosed with diabetes.

I would ask that whatever sentence you give him, you make a recommendation to the Department of Corrections that he be placed in an appropriate medical facility of the Department of Corrections.

Again, his substance abuse history is pretty well outlined in the pre-sentence report, Your Honor. I do find it troubling that he never got help. It is unfortunate but here he is, Your Honor.

It's funny. He described his childhood as good but when I look at it, he had a mentally abusive father and examples around him of drunk all the time. It is no wonder, he, himself, grew up to be addicted to both drugs, alcohol. He kicked the drugs now but he still had an alcohol problem at the time of this incident and by all accounts,

Page 10

Commonwealth vs. White

every witness got up there, and I asked every one of them because I hoped we wouldn't be here this day but I knew it was a possibility, about how drunk he was. We heard everything from stumbling drunk, to drunk, to his usual self. So, clearlily, he has an alcohol problem at this point, Your Honor.

He was interestingly diagnosed with PTSD, Your Honor, having the symptoms of PTSD and in his mental health report -- he never revealed this to me. I asked him about it this morning -- he revealed to the evaluator he was having nightmares.

So he and I talked about this this morning and he told me he relives this moment over and over again in his mind, that it keeps him up at night, that he has nightmares. He will tell you he knew this boy. He knew this boy growing up. This isn't something he wanted to happen. It is something he is greatly ashamed of, greatly remorseful for.

Page 11

Commonwealth vs. White

I think when you consider all of these factors, Your Honor, that you should sentence him to a sentence well below the guidelines. I think you should depart for those reasons and fashion a sentence that is more in line with a manslaughter conviction.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Reynolds.

Miss Ghadiri.

MS. GHADIRI: Thank you, Your Honor.

Your Honor, I don't want to relitigate the jury trial in front of you but the jury did find the Defendant guilty of third degree murder and I think a lot of the facts that Mr. Reynolds left out kind of show more of the malice that is nonexistent in the manslaughter charge.

First of all, December 31st of 2017, it is supposed to be New Year's Eve, it is supposed to be a day of celebration and Miss Brown testified

Page 12

Commonwealth vs. White

that she is waking up and she is preparing food, cooking in the kitchen when this Defendant, who was drunk, is saying and escalating an argument continuously throughout the day. He will not let it go. He had thrown her clothes outside on the porch the night before.

When that died down, he still continued the escalation here to the point where he hid her gun underneath a couch cushion. He managed to toss out all of her items but kept the gun for himself.

In that case, he puts the gun underneath the couch cushion and as he is purposely escalating an argument, demanding that they move out of the house and when Miss Brown tells him that in five days, they are going to be out of that house, they were about to leave, he still doesn't take that for an answer.

It is the decedent, it is Emanuel Brown, who acts more like a man,

Commonwealth vs. White

more like an adult than this Defendant because Emanuel Brown gets up from that basement where he was sleeping and he tries to de-escalate. He tries to stop the argument from happening. That is undisputed.

It is this Defendant that goes to that couch cushion, that grabs that gun that he hid and points it at Emanuel and even after pointing it at Emanuel, he had previously before that threatened Emanuel.

So to say that this is just an accident, when the Defendant not only threatens the decedent, points the gun at him and when the decedent, who sees his sister, his baby niece, his mother, his neighbor all in that house, he tries to protect them. He tries to protect them by trying to put his body between his family and the Defendant because he is holding a gun. That gun goes off. That muzzle of that gun is pressed up to his chest.

Emanuel Brown is 27 years old.

Commonwealth vs. White

He has no criminal record. He has two young daughters, Mariah and Miasia (ph.), who are 5 and 9 years old. They are without a father now because this Defendant couldn't handle the fact that they were moving out in five days. He couldn't wait for five days. That is just what happened up until the shooting. How this Defendant acted after the shooting as well is egregious.

He was with Gloria Brown for 13 years. Emanuel Brown is almost like a son to him or should have almost been like a son to him and when that bullet goes into his chest and Emanuel is on the ground, dying in front of everyone's eyes, he just walks away. Gloria testified and the family testified there was no look of remorse on his face. There was no look of shock or panic. He just got out of that house and that is also on video.

So when Mr. Reynolds wants to argue he was a stumbling drunk, we see his movements on the video. We see that

Commonwealth vs. White

he wasn't stumbling. He was walking and he even points that gun at Tanyiah Jackson, who is yelling at him from the porch, and he gets into his car. He drives. We see that on video. The car is not weaving. The car is not going back and forth. He parks in front of the beer store.

THE COURT: He hits a car.

MR. REYNOLDS: He does.

MS. GHADIRI: He hits a car. I'm sorry. The door is flying open and as the neighbor is attempting to stop him, he sideswipes the car on the way out. I was referring to when he was driving to the beer store, there is nothing unusual about the movement of the car at that time.

You see him walk in the store. You see him on the phone, talking. There is no stumbling. There is no falling. The motions and movements are normal and then what he does is he ditches the car. He flees to Newark, New Jersey and the gun is never

Commonwealth vs. White

recovered.

These are the actions of someone who acted with malice, someone who killed a 27-year-old young man, that should have been like a son to him, and just walked away.

I understand he has battled with his addictions. It is in the PSI. I understand that he had issues with alcohol. I understand that they were drinking the night before but none of that was enough to negate what he did that night.

He has been arrested fourteen times. He has seven convictions, three commitments, three revocations. This is someone who had possessed a gun before in the past. This is someone who has been through the system, that knows the consequences to his actions.

He is 60 years old. He is 60 years old, that pointed a gun at an unarmed 27-year-old man in his pajamas that night, and when we talk about a sense of justice and we talk about

Commonwealth vs. White

proportionality, the 20 to 40 is an aggregate for the third degree murder and the 6105.

I think if those two charges ran consecutively to each other, they are within the guidelines. Whether it is a 4 or whether it is a 3 prior record score, they are within the guideline sentence if they run consecutively to each other and that is what I am asking for here, Your Honor.

I saw nothing within the PSI. I understand that he was employed for five years at a cleaning company beforehand, so to sit there and say that some sort of addiction was controlling or ruining his life, he seemed to have been maintaining and being functional to the point where it wasn't. The only reference of alcohol came from drinking from the night before.

It is nothing to sit there and to say that the alcohol or the addiction was the reason for this. If what I say is unjust, then I just don't agree with

Commonwealth vs. White

that at all. Your Honor, I believe a sentence of 20 to 40 years for the third degree murder, consecutive to the 6105 is appropriate, and Mr. Reynolds indicated that he has some physical ailments, as well as maybe some mental health conditions. If he is put in a state facility that can address those conditions, we would have no objection to that whatsoever.

Other than that, Your Honor, that concludes my portion. I do have family members that wish to speak.

THE COURT: You may call them.

MS. GHADIRI: Thank you.

Miss Brown.

COURT CRIER: State your full name, spell your last name.

THE WITNESS: Gloria Brown; B-R-O-W-N.

- - -

GLORIA BROWN, having been first duly sworn, was examined and **testified, as follows:**

- - - -

Commonwealth vs. White

MS. GHADIRI: Miss Brown, would you like to address the Judge?

THE WITNESS: Yes.

MS. GHADIRI: What would you like to tell the Judge?

THE WITNESS: About my son.

MS. GHADIRI: What would you like to tell her?

THE WITNESS: My son, 27, my first born, the oldest grandchild and the first grandchild. He didn't deserve that.

Emanuel was sweet. He wasn't perfect but he was a sweet child and he would do anything to protect his family. When his dad passed, he had to stand up as a man. When he had his daughter, my son went on his own and took classes to be a better man because he knows he fell short in some aspects and that helped him.

My son wasn't sick. My son was healthy. My son took himself out of high school and made a decision before he was a part of the streets to go to

Commonwealth vs. White

Job Corps to become something. He wanted to be a carpenter. My son worked every day. He enjoyed working. Emanuel was my comedian. When I was down and I was sick, he would put a smile on my face. We used to skip down the street, laughing.

I remember one day I was sick. I have been at death's door twice and I was sick and I made it to the bathroom but I couldn't come back from the bathroom and I was sliding down the wall and my son showed up and picked me up in his arms and put me back in my bed.

My son should not be gone. That was my first born. We talked about any and everything, any and everything. As a single mom, I taught my son to stay out of the street. I could have lost my son to the street. My son could have been part of a gang, Judge.

I was hard on my son to stand as a black male, be there for his children. My father was not there for me. My mother was on drugs and I

Page 21

Commonwealth vs. White

struggled every day. Once I decided to have kids, I am going to protect my kids. I know right from wrong, like any of us, and I taught my kids the same.

My son would try and talk a dispute, not fight it out. That wasn't his first thing. It was to diffuse it. If I was wrong, my son would tell me I am wrong. If Mr. White was wrong, he would tell him he is wrong. If my son got angry, I would tell my son go for a walk. If there is a problem in the household, I would call Mr. White's family to tell them what the problem was.

We always tried a way and that day, he took my baby, my oldest baby from me. I'm hurt. I'm destroyed. I want him to have the maximum because my pain, and my hurt, the nightmares, they are at their max. I am barely sleeping, Your Honor. I am barely sleeping. I relive this every day. I relive this right now and the look he gave me when he shot my son, if it was an accident,

Page 22

Commonwealth vs. White

why didn't you stay? Why didn't you apologize? Why didn't you put pressure on that hole with me? When you called my son your son, when you told my son you loved him, why didn't you stay there if it was an accident?

I see my son in that casket the same way I held him in my arms and wrapped him up. I had to wrap my son up in that casket. I didn't make it to the hospital to even see my son. I felt like it was my fault. I didn't protect him as a mother, like I should. I did the best that I could. I hope my son knows that I did the best that I could.

I want him to have the maximum, Your Honor. I don't think there is no remorse. The day he looked at me when he walked out that door after he shot my son, there is no remorse.

I can't get my son back. I never got to hold my son the last time. I had to kiss him in that casket and wrap him back up. No mother should endure burying their child, never,

Page 23

Commonwealth vs. White

never. In the Bible, it says he didn't give life. God gave life. So why did he take a life if he can't give it back? Give him the maximum, Your Honor, please, please.

Thank you.

THE COURT: Thank you.

- - -

(Whereupon, the witness is excused, at this time.)

- - -

MS. GHADIRI: Tanyiah Jackson, Your Honor.

COURT CRIER: State your full name, spell your last name.

THE WITNESS: Tanyiah Jackson; J-A-C-K-S-O-N.

- - -

TANYIAH JACKSON, having been first duly sworn, was examined and testified, as follows:

- - -

THE WITNESS: I just wanted to speak about my brother and how he was. I just miss the times, the laughter and

Page 24

Commonwealth vs. White

him being there and being able to talk to somebody. I lost my dad in 2015. My dad went brain-dead. I had a father but after that, I didn't have nobody to turn to but my brother.

If I had a problem with something, I would just talk to my brother. He was able to tell me about men and stuff like that. I don't have that now. I miss him every day.

I really don't do anything. I stay home a lot. I work. I take care of my son. I just wish that my son had his uncle to play with. We have family but not much. We are small, but I just wish that my brother was here.

He always kept a smile on everyone's face, laughing, dancing. He loved to dance. I do a lot of dancing. That is what we had in common. Me and my brother would always be in the house dancing a lot.

I just miss hearing his voice, seeing him, being there for us. A lot of things have changed. Holidays aren't

Commonwealth vs. White

the same. I don't want to do anything anymore. I just want my brother back. If I could have my brother back, things would be okay. It ain't okay. It is not the same for me anymore.

That is all I want to say.

THE COURT: Thank you.

- - -

(Whereupon, the witness is excused, at this time.)

- - -

MS. GHADIRI: Your Honor, if I can call Rashawn Pierce to the stand.

COURT CRIER: State your full name, spell your last name.

THE WITNESS: Rashawn Pierce; P-I-E-R-C-E.

- - -

RASHAWN PIERCE, having been first duly sworn, was examined and testified, as follows:

- - -

THE WITNESS: I am Gloria's oldest daughter. I just want to tell everybody a little bit.

Commonwealth vs. White

Me and my brother grew up together. We were right behind each other in age. Every time he took a step, I took a step. My brother used to call me his little, big sister because I was the one who would step into certain situations and be there and tell him enough is enough.

That night before everything happened and all the commotion and everything was going on, I had a conversation with my brother and I told him, I said you're leaving in five days. Don't feed into it. Don't argue with him. Let him do what he do.

My brother texted me back and said you make it seem like he's going to do something to me, his words. I wasn't there that day but to get a phone call and say that your brother has just been shot and knowing he said those words to you the night before, it hurts because I felt like me being his little, big sister, I wasn't there. I was the person, when Kenny would act crazy, I

Commonwealth vs. White

would calm him down. I could do that. I seen him that night. Everything was okay and then it just sort of started back up again.

My brother had his moments when he got mad or he was angry but it never was I am just going to lash out and attack. It was not like that. The only time my brother got in trouble was for hitting a boy who punched me in my eye. That is what he was, a protector, protect his family.

It's just me, my mom and my sister. It was my brother. Now it's just us. There is no dad. There is no brother. It's just three girls trying to live, and keep each other up, and protect each other.

This situation did so much to my family. My mom moved to Florida. She is leaving because Philly just took so much from her. Only me and my sister are left here together, trying to ride this out. If it weren't for the friends that we have to keep us up, we all would

Commonwealth vs. White

have went down. Not only does the situation affect us, we are adults, we can carry ourselves, it affected kids.

My kids look at the picture of this man and say Pop-Pop still. My son is 10 years old. He is so angry. He is so angry because he said my Pop-Pop took my uncle. There is no reason that kids should have to deal with something like this.

The same way if he is hurt and we are hurt, we have to think about these kids. They are going to grow up to remember this stuff. To see all of this, it's hard. It's hard to trust somebody, knowing that a person who said they loved you for thirteen years, to do something like this to us. You can't trust nobody. Loyalty don't mean nothing no more. Every day we walk down the street, we have to think and look at life differently because of this situation.

I just ask that he gets what he deserves, the maximum, and today I

Commonwealth vs. White

wasn't going to say nothing but I felt like I had to get up here for Emanuel. That is all we want is justice for my brother, that's it and that is all I have to say.

THE COURT: Thank you.

- - -

(Whereupon, the witness is excused, at this time.)

- - -

MS. GHADIRI: Your Honor, Juarvez Pierce.

COURT CRIER: State your full name, spell your last name.

THE WITNESS: Juarvez Pierce; P-I-E-R-C-E.

- - -

JUARVEZ PIERCE, having been first duly sworn, was examined and testified, as follows:

- - -

THE WITNESS: I am Gloria's niece, Emanuel's cousin. Emanuel was more like a brother to me. He talked to me. I didn't have a dad. I could

Commonwealth vs. White

barely talk to my brother.

So Emanuel was my go-to. I talked to him about problems I'm having, stuff I'm going through and he was always there to talk to me, even when he was in Job Corps and I called him. He was great. He still answered my phone calls and for me not to be able to call my cousin and tell him what's going on with me or call him when something is wrong, it hurts me because I can't have my cousin back. I feel like Kenny should get the maximum because he is still here. His family can still talk to him. They can still see him.

We can't get my cousin back. We can't see my cousin's face no more unless it is on a picture, and my family is hurting. They are hurting. We barely got boys in our family. We can count on our hand how many boys we have. So for one of our boys to be gone, it hurts. It hurts. It hurts very bad and I am asking you and I am begging you, please, please, give justice for my

Commonwealth vs. White

cousin, Emanuel Brown.

THE COURT: Thank you.

- - -

(Whereupon, the witness is excused, at this time.)

- - -

MS. GHADIRI: Your Honor, lastly, Ashley Thomas.

COURT CRIER: State your full name, spell your last name.

THE WITNESS: Ashley Thomas; T-H-O-M-A-S.

- - -

ASHLEY THOMAS, having been first duly sworn, was examined and testified, as follows:

- - -

THE WITNESS: My name is Ashley. Emanuel was a long-time friend to me. We went to high school together. When I met Emanuel, he was kind. He was sweet. Every time I was getting in trouble, he was always there. I got kicked out of school and then I started hanging around with him. I didn't

Commonwealth vs. White

really have a family. So when me and Emanuel became cool, his family took me in as his family. So now I don't have a friend but I have his family.

I just think about the good times and try not to think about the bad times and when I got the phone call that day, I didn't want to believe it. I still try not to believe it but it's true.

Today, I just want justice for my friend. I can't have my friend back but I will just keep memories that I have for him. That is all I have to say.

THE COURT: Thank you.

- - -

(Whereupon, the witness is excused, at this time.)

- - -

MS. GHADIRI: Your Honor, I have no more testimony. There is restitution requested in this case, funeral expenses in the amount of $4,152.00 and I would just submit my

Page 33

Commonwealth vs. White

memo, which has been e-filed, as Commonwealth's Exhibit C-1.

- - -

(Whereupon, a Document was marked as Exhibit C-1, for identification.)

- - -

**MS. GHADIRI**: With that, Your Honor, I have nothing further.

**THE COURT**: Mr. White, you have the right to speak prior to sentencing.

Is there anything that you wish to say?

**MR. REYNOLDS**: Judge, before he speaks, I just want to place on the record all the family members who are here. While we were in here debating the prior record score, some were coming while I was doing that, so.

You have Mr. White's sister, his niece, his granddaughter, his brother, his sister-in-law, his daughter and his nephew. (Indicating).

We submitted, I believe, eight

Page 34

Commonwealth vs. White

letters and a letter from my client also.

**THE COURT**: I read them, yes.

**MR. REYNOLDS**: Thank you, Your Honor.

**THE COURT**: Mr. White, you have the right to speak prior to sentencing.

Is there anything that you wish to say?

**THE DEFENDANT**: Good afternoon, Your Honor.

**THE COURT**: Good afternoon.

**THE DEFENDANT**: It is so hard. This was not supposed to happen. This was an accident. I never intended for this to happen this way. I'm so sorry.

Gloria, Tanyiah, Rashawn, you all know in my heart, I never meant to hurt that boy. I loved him. I'm so sorry this happened. This was not supposed to happen. It was an accident. I wish I could bring him back. I think about him every day. It has been real hard. I want you to all know that I am

Page 35

Commonwealth vs. White

very sorry that this happened.

Thank you, Your Honor.

**THE COURT**: The Court reviewed the pre-sentence report, the mental health evaluation, the letters sent on behalf of the Defendant by his family and the Commonwealth's sentencing memorandum. The Court is very familiar with the facts of this case and listened very carefully to the victim impact testimony.

The pain in this room is palpable. What that means is you could feel it, it is so strong, how the acts of one person can cause such deep and lasting pain.

The problem with this is, and I hear what the Defendant is saying, that he had a longstanding relationship with this young man but the bottom line really is this, it is the Defendant who introduced alcohol into the situation. You had a drinking problem. When you have a drinking problem, you don't think right. When you don't think right, you

Page 36

Commonwealth vs. White

make poor decisions and you cause a lot of problems.

You introduced the gun into the situation because without a gun, you would have been fairly harmless against him but you went out of your way to put that gun -- I don't know why -- into the couch seat, so it was right there when the conflict occurred. You introduced the anger and conflict into the situation, fueled by alcohol.

You kept this going. You just kept it going. You instigated a situation. How could you not think a young man would stand up for his mother, his sister? It is unreasonable. That is what alcohol does to your brain. There is no young man that will let you threaten his mother and not have a strong reaction to that.

All of that conduct, that came from you, sir, and it was a recipe for disaster and I don't give a lot of weight to what somebody does afterward because I know that people do all sorts

Page 37

Commonwealth vs. White

of things after an event like this happens because they are frightened but I give it some weight, a little weight.

If you loved him like a son, you stay there. You help. You admit what you did. You remain there and you try to ameliorate the damage that you did, and the problem here is because of your alcohol addiction, because of your anger, you took a life and because you took that life, you ruined so many lives, fatherless children. We have people here who are suffering, really suffering.

I do take into consideration the age of this Defendant. He is 62 years old. The fact that for 13 years, he remained arrest free, and that he does have a serious substance abuse problem. It is presently with alcohol but he had a substance abuse problem throughout his life.

Based on everything I have said, the sentence of the Court is, as follows: On the charge of third degree

Page 38

Commonwealth vs. White

murder, the sentence of this Court is 15 to 30 years, possession of a firearm prohibited, 2-and-a-half to 5 years to run concurrently. Funeral expenses are ordered in the amount of $4,152.00. Court costs are ordered.

You can advise, Counsel.

MR. REYNOLDS: Thank you.

Mr. White, the Judge just sentenced you to an aggregate sentence of 15 to 30 years incarceration.

Do you understand the sentence that you received?

THE DEFENDANT: Yes.

MR. REYNOLDS: You have ten days from today to file a motion with Her Honor to reconsider that sentence. It must be in writing. It must be done by an attorney. As your court-appointed counsel, I will do it for you, if you request.

We've already had a conversation about that; is that correct?

THE DEFENDANT: Yes.

Page 39

Commonwealth vs. White

MR. REYNOLDS: You wish me to do that; correct?

THE DEFENDANT: Yes.

MR. REYNOLDS: At the conclusion of that motion or if you do not want me to file that motion, you have thirty days from today to file an appeal with the Superior Court. Again, it must be in writing. It must be done by an attorney.

As your court-appointed attorney, I will do that for you, and we had a conversation about that already?

THE DEFENDANT: Yes.

MR. REYNOLDS: You do wish me to file an appeal; correct?

THE DEFENDANT: Yes.

MR. REYNOLDS: Are you satisfied, Your Honor?

THE COURT: Yes.

MS. GHADIRI: Thank you, Your Honor.

May I be excused?

THE COURT: Yes.

MR. REYNOLDS: May I be

Page 40

Commonwealth vs. White

excused, Your Honor?

THE COURT: Yes.

Thank you both.

- - -

(Whereupon, the proceedings were adjourned, at this time.)

- - -